**Joyce E. KEEGAN, Appellant,**

v.

**Margaret HECKLER, Secretary of Health and Human Services.**

No. 84–1113.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) Sept. 10, 1984.

Decided Sept. 24, 1984.

Jack I. Kaufman, Allentown, Pa., for appellant.

Edward S. G. Dennis, Jr., U.S. Atty., Edward T. Ellis, Asst. U.S. Atty., E.D.Pa., Beverly Dennis, III, Regional Atty., David L. Hyman, Asst. Regional Atty., Dept. of Health and Human Services, Philadelphia, Pa., for appellee.

Before GIBBONS and GARTH, Circuit Judges, and TEITELBAUM, District Judge.[*]

---

[*] Hon. Hubert I. Teitelbaum, Chief Judge, United States District Court for the Western District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

Joyce E. Keegan appeals from a summary judgment in favor of the Secretary of Health and Human Services in her action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) (1982), for a review of a denial of disability benefits under Title II and Title XVI of the Social Security Act. Keegan contends that the district court erred in its interpretation and application of the guidelines for the termination of disability benefits as set forth in *Kuzmin v. Schweiker*, 714 F.2d 1233 (3d Cir.1983). We agree and therefore reverse.

### I.

Ms. Keegan, born in 1932, and formerly employed as a secretary, applied for disability insurance benefits on June 28, 1976. Her application was denied initially and on reconsideration by the Office of Disability Operations of the Social Security Administration. The case was considered *de novo* by an Administrative Law Judge (ALJ) who, in a decision dated April 27, 1978, determined that Ms. Keegan was disabled for purposes of the Act, and that her disability commenced on November 8, 1974. The ALJ concluded, based in part on medical reports from Doctors Farber and Chirieleison, that Keegan was disabled due to a combination of: "(1) rheumatic heart disease, (2) mitral stenosis and insufficiency with the insufficiency predominating, and (3) anxiety." Subsequently on April 30, 1978 Ms. Keegan filed for and was granted Supplemental Security Income Benefits.

On June 23, 1981 Ms. Keegan was notified that her disability had ceased as of May, 1981 and that her benefits would be terminated as of July, 1981. The administration in its notice advised Ms. Keegan that her benefits had been initially granted "because of rheumatic heart disease," Tr. 163, and that the medical evidence indicated that her heart was currently enlarged and that her cardiogram reflected "some non-specific changes consistent with [her] condition." Further the evidence showed, according to the notice, the absence of symptoms indicative of congestive heart failure, chest pains or fainting spells. Tr. 163. Accordingly, she was advised that "[i]n view of the evidence you have the functional ability to perform your customary occupation as a secretary as it is generally performed in the national economy." Tr. 163.

Following a hearing which was requested by Ms. Keegan, the ALJ found that Ms. Keegan was unable to work as a secretary since that activity involved "light exertion" as defined in 20 C.F.R. § 404.1567(b) (1984), but that she retained sufficient residual capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) (1984). The ALJ determined that Ms. Keegan's past work experience should be classified as "skilled" as defined in 20 C.F.R. § 404.-1568(c) (1984), and that these clerical skills were transferable to sedentary work. 20 C.F.R. § 404.1568(a) (1984).

The ALJ's opinion, relying heavily on the report of Dr. Kastenbaum who examined Ms. Keegan for the Administration, conceded that the claimant suffers from rheumatic heart disease with probable mitral insufficiency along with a history of atrial fibrillation, and that this impairment "significantly limits her physical ability to perform basic work related activities." Tr. 22. The ALJ stated that Ms. Keegan's symptoms are aggravated by exertion but relieved by rest and that she was "able to carry out her daily activities without much in the way of symptoms." This latter observation is apparently taken from Dr. Kastenbaum's report. Tr. 179.

The Appeals Council refused to review the ALJ's opinion, thereby making the Secretary's determination of non-disability final. Ms. Keegan appealed the decision to the district court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) (1982). Each party moved for summary judgment, and the matter was referred to a magistrate for a recommendation. The magistrate reviewed the evidence and recommended that Ms. Keegan's motion for summary judgment be denied and the Secretary's motion for summary judgment be granted. In addressing

one of Ms. Keegan's contentions, namely, that the ALJ made an error of law in determining that her disability had ceased, the magistrate's report discussed our decision in *Kuzmin*. The report stated that *Kuzmin* was satisfied in that Ms. Keegan failed to meet her burden of proof by showing that her condition remained the same as it was at the time of the earlier determination of disability. The magistrate's report seems to base this conclusion on the lack of additional medical evidence subsequent to the initial determination of disability attributable to the fact that Ms. Keegan was not being treated by any particular physician since 1977.

Ms. Keegan contends that the magistrate's interpretation of *Kuzmin* was incorrect.[1] She argues that her testimony constituted evidence of a continuing disability which thereby effectively shifted the burden of proof to the Secretary to present evidence of sufficient improvement in her condition to permit her to undertake "gainful activity."

The district court adopted the recommendation of the magistrate and granted the Secretary's motion for summary judgment. The court held that the guidelines for the termination of benefits provided by our decision in *Kuzmin* were properly followed. First, the court concluded that Ms. Keegan failed to introduce "sufficient evidence that her condition is the same or worse when compared to her condition at the time of the prior finding of disability." App.

8A at 4. Second, the court concluded that even if a presumption of continuing disability was created by Ms. Keegan, Dr. Kastenbaum's report was sufficient evidence to enable the Secretary to rebut the presumption of continuing disability.

Since Ms. Keegan's sole ground for appeal rests on the district court's alleged error in interpreting and implementing our decision in *Kuzmin*, that is the only issue we need address.

## II.

■ Our inquiry is limited to a determination of whether the Secretary's final determination of non-disability[2] is supported by "substantial evidence," 42 U.S.C. §§ 405(g) and 1383(c)(3) (1982), which has been defined as such evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). In our decision in *Kuzmin* we addressed the effect to be given to a prior determination of disability on a subsequent decision to terminate benefits. We concluded that both basic principles of fairness and the need to provide the appearance and fact of consistency in the administrative process dictate that "once the claimant has introduced evidence that his or her condition remains essentially the same as it was at the time of the earlier determination, the claimant is entitled to the benefit of a presumption that his or her condition remains disabling." *Kuzmin*, 714 F.2d at

1. Ms. Keegan also raised several other objections before the district court, namely: that the ALJ's conclusion regarding Ms. Keegan's residual functional capacity was not supported by substantial evidence; that the absence of a vocational expert's testimony along with the ALJ's taking administrative notice of the existence of sedentary work or that Ms. Keegan could do such work constituted legal error; that Ms. Keegan's inability to afford a doctor or her refusal to complete a stress test should not provide the basis for a finding of lack of disability. The district court addressed all the arguments except for the final one, finding it unnecessary for the disposition of the case. We will deal, however, only with the objection arguing a misapplication of *Kuzmin* since that is the sole ground on which Ms. Keegan's appeal to this court rests.

2. Both for purposes of disability insurance and for SSI benefits, disability has been defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A) (1982). A person is disabled within the meaning of these provisions "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B) (1982).

1237. Regarding the nature of proof that must be offered by a claimant, our decisions in both *Kuzmin* and *Daring v. Heckler*, 727 F.2d 64 (3d Cir.1984), are instructive. In *Kuzmin* we stated that a claimant may meet his or her burden by relying on medical evidence previously introduced, supplemented by the claimant's own testimony of the continuing nature of the disability. *Kuzmin*, 714 F.2d at 1237. Any doubt which may have persisted after *Kuzmin* as to the sufficiency of a claimant's own testimony standing alone to raise the *Kuzmin* presumption has been resolved in *Daring* wherein we recognized that this was an adequate means of proof. Thus, once the claimant produces evidence of continuing disability, the burden of proof, or more properly the risk of non-persuasion, shifts to the Secretary to produce evidence that the claimant is capable of undertaking gainful activity in order to rebut the presumption of continuing disability. *Kuzmin*, 714 F.2d at 1237.

### III.

■ In the present case the district court's conclusion that Ms. Keegan failed to meet her burden under *Kuzmin* was in error. The record reflects that in addition to giving testimony of a continuing disability Ms. Keegan did in fact offer additional medical evidence at the hearing itself. Specifically, at the hearing Ms. Keegan introduced medical reports from St. Joseph Hospital, dated April 23, 1982, and records resulting from a visit to the Reading Hospital and Medical Center Emergency Unit. Ms. Keegan had been brought to the hospital by a friend because she complained of weakness, poor appetite and palpitations. Tr. 191. While this additional evidence alone would likely be sufficient to raise the *Kuzmin* presumption, our decision in *Daring* makes it clear that her testimony standing alone was sufficient to create the presumption of continuing disability. *Daring*, 727 F.2d at 69.[3] The Secretary argued in her brief that a leading

question asked by Ms. Keegan's attorney cannot be sufficient even under *Daring* to satisfy the *Kuzmin* burden. Brief for Appellee at 10. The exchange referred to by the Secretary was:

BY ATTORNEY:

Q: Mrs. Keegan, 1978, based on the evidence, there was evidence indicating that you experienced frequent fatigue and weakness to the point where you could not do your housework. Okay. Is that still your situation?

A: Yes

Tr. 35.

■ The Secretary's argument is without merit for two reasons. First, the Secretary's objection to the form of the question is inappropriate given the liberal evidentiary rules governing administrative hearings. Section 556(d) of the Administrative Procedure Act provides, "[a]ny oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence." The record nowhere reflects the ALJ's instructions to Ms. Keegan's counsel to frame his questions in a certain way. Thus, if the Secretary simply objects to the form of the question, the objection is incorrect. If, on the other hand, the Secretary is arguing that Ms. Keegan's answer cannot be sufficient to meet her *Kuzmin* burden because she is only adopting the words of her attorney, the argument must also fail. The question must be fairly read to constitute the attorney's asking if Ms. Keegan feels any better now than she did at the time of the initial hearing. Given the nature of disability benefit termination proceedings, such a question can hardly be improper.

The other flaw in the Secretary's argument concerning the "leading question" is that it implicitly assumes that the above referred-to exchange between Ms. Keegan and her attorney is the only portion of her

3. In *Daring* we also pointed out that a claimant could meet the *Kuzmin* burden with evidence of continued episodes of hospitalization or even

medical reports relied on by the Secretary. *Daring*, 727 F.2d at 69.

testimony that arguably could furnish a basis for the presumption of continuing disability. This argument is curious particularly since the Secretary's own brief concedes that the record does contain a "claim" by the claimant that her condition remained the same as it was at the time of the initial hearing. In any case it is clear that Ms. Keegan's testimony, taken as a whole clearly meets her *Kuzmin* burden. For example, she testified to difficulty with climbing stairs, and doing housework, weakness in the legs, collapse, and episodic palpitations. Tr. 36–37. These symptoms are undeniably consistent with continuing disability.

Similarly, we can dispose with the Secretary's argument that Ms. Keegan failed to meet her *Kuzmin* burden because she testified that she was somewhat less anxious than she had been at the time of the prior hearing, at least to the extent that her former husband was a source of her anxiety. Appellee's Brief at 10. This is similar to the situation posed in *Daring* where we concluded that "[t]here is also no basis to support the ALJ's reliance on his own impressions that Daring's relationship with her former boyfriend had been *'primarily responsible* for the claimant's severe emotional outbursts.'" (emphasis in original). *Daring,* 727 F.2d at 70. In the present case there is similarly no basis for an inference that Ms. Keegan's husband was the sole cause or even a significant cause of Ms. Keegan's anxiety. Indeed, it is more likely that Ms. Keegan's physical condition and the attendant difficulties she experiences in attempting to cope with her illness are the main source of her anxiety. The Secretary's argument has even less force than it would have if posed in *Daring,* since in the present case, unlike *Daring,* the ALJ's opinion never mentioned Ms. Keegan's supposed reduced anxiety in her findings.

The district court also concluded that notwithstanding Ms. Keegan's failure to meet her burden, the Secretary met her burden of proof to rebut the presumption of continuing disability. In view of our conclusion that Ms. Keegan did offer suffi-

cient evidence to raise a presumption of continuing disability, we must turn to the issue of whether there is substantial evidence to support the Secretary's findings that Ms. Keegan's disability had ceased. If we conclude, as the district court did, that the Secretary's decision was supported by substantial evidence we would have to accept her findings as conclusive. *Daring,* 727 F.2d at 68. In this regard the district court stated that the Secretary met her burden with Dr. Kastenbaum's report and the testimony of Ms. Keegan.

As in *Kuzmin* a comparison between the evidence before the first ALJ and the termination proceedings record reveals a marked similarity between the two. *Kuzmin,* 714 F.2d at 1238. For example, the first ALJ in finding disability considered the medical reports of Drs. Farber, an administration consultant, and Chirieleison. Tr. 142. Dr. Farber concluded that Ms. Keegan was suffering from "rheumatic heart disease, mitral stenosis and insufficiency with the insufficiency predominating ... enlargement of the left atrium and the outflow tract of the left ventricle," along with "premature atrial and ventricular contractions." Tr. 107. That report continued

> Mrs. Keegan has evidence of strain on her cardiovascular system resulting from her damaged mitral valve. If progression of the strain is to be kept to a minimum she will have to curtail her physical activities. She has too much to care for at home and should really have help with her housework. She could not consider doing work outside of the house and continuing with her housework. If she had a job, it would have to be a sedentary type of occupation, *and* she would then have to have *full time* help at home.

Tr. 107 (emphasis added). Dr. Chirieleison stated in his report that Ms. Keegan had a "significant cardiovascular problem with her mitral stenosis and insufficiency causing her to have some evidence of cardiac decompensation in regards to her supraventricular tachycardia." Tr. 134. He also referred to a stress cardiogram which

showed "marked impairment of her functional aerobic impairment [sic]." Tr. 134. Dr. Chirieleison concluded that "Mrs. Keegan with her rheumatic valvular disease is certainly not capable of performing any strenuous activity or indeed any employment which would require her to be under stress." Tr. 134.

The ALJ in the second *de novo* hearing considered all the foregoing along with the medical report of an administration consultant, Dr. Kastenbaum. Dr. Kastenbaum concluded that Ms. Keegan had an enlarged heart, rheumatic heart disease with mitral valve disease which was most likely mitral stenosis, and that she probably has episodes of atrial fibrillation. He classified her as "American Heart Association Class 2 to 3." [4] Tr. 179. The ALJ apparently seized upon the portion of Dr. Kastenbaum's report which stated that Ms. Keegan "is apparently able to carry out her daily activities without much in the way of symptoms, *but* does get help with her housework by her children" and that she "[h]as not had symptomatic failure for the last four years *at least that required hospitalization.*" Tr. 179 (emphasis added).

■ Given the substantially similar clinical findings of Drs. Farber, Chirieleison and Kastenbaum, namely an enlarged heart, rheumatic heart disease, and mitral stenosis, along with Dr. Kastenbaum's classification of Ms. Keegan as being between American Heart Association 2 and 3, it is apparent that her condition has not improved to the point where she is capable of gainful activity. A person between American Heart Association classes 2 and 3 will experience symptoms at something less than ordinary activity and is only asymptomatic at rest. Further, Dr. Kastenbaum's statement to the effect that Ms. Keegan is

capable of conducting her daily activities "without much in the way of symptoms" was conditioned on her receiving help with her housework from her children. The language suggests that Ms. Keegan might not be able to conduct her daily activities, much less hold down a job, without help with her housework. This is practically identical to the conclusion reached by Dr. Farber, Tr. 107, which was one basis for the initial determination of disability.

The ALJ also apparently relied on Dr. Kastenbaum's noting the absence of "symptomatic failure" for four years "at least that required hospitalization." The non-occurrence of an attack serious enough to require hospitalization is hardly inconsistent with a continuing disability. All three examining physicians and the ALJ at the termination hearing concurred that Ms. Keegan could be asymptomatic if she remained at rest; and that any symptoms she does experience can be relieved by rest. Therefore, the very nature of her illness is such that if she carefully limits her activity she should not require hospitalization. Hence, the absence of symptoms severe enough to require hospitalization in this case does not constitute substantial evidence of non-disability. In this regard it is also instructive to note that Dr. Kastenbaum considered Ms. Keegan's condition serious enough to warrant consideration of her as a possible candidate for open-heart surgery. Tr. 179.

Based on the foregoing we conclude that Dr. Kastenbaum's report did not furnish a basis for rebutting the presumption of continuing disability. We shall briefly consider the district court's conclusion that Ms. Keegan's testimony constituted suffi-

---

**4.** The American Heart Association has developed a system of classification which categorizes heart patients in terms of the types of activity which will produce symptoms. The classification scheme states in pertinent part:
Functional Class II: Patients with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea, or anginal pain.

Functional Class III: Patients with cardiac disease resulting in marked limitation of physical activity. They are comfortable at rest. Less than ordinary physical activity causes fatigue, palpitation, dyspnea, or anginal pain.
Diseases of the Heart and Blood Vessels—Nomenclature and Criteria for Diagnosis, N.Y. Heart Association (6th ed. 1964).

cient evidence to enable the Secretary to rebut the *Kuzmin* presumption.

The district court's memorandum opinion stated that "[t]he Secretary has met her burden by showing through Dr. Kastenbaum's report and by testimony from the plaintiff, that the plaintiff is not now disabled." App. 8A at 4. If the district court is suggesting that Ms. Keegan's testimony standing alone can furnish the basis for rebutting the *Kuzmin* presumption, we point out that this issue was not addressed in *Kuzmin* or *Daring.* In *Daring* we made it clear that a claimant could meet her *Kuzmin* burden by offering her own testimony, and then be given the benefit of a presumption of continuing disability. Once the claimant offered such evidence the Secretary "must present evidence, that there has been sufficient improvement in the claimant's condition to allow the claimant to undertake gainful activity." *Kuzmin* 714 F.2d at 1237. While it is conceivable that a case could arise where the testimony of the claimant alone is sufficient to rebut the *Kuzmin* presumption of continuing disability, our concerns for "[b]asic principles of fairness as well as the need to provide both the appearance and fact of consistency" lead us to conclude that, at least in most cases, the Secretary should rely on more than solely the claimant's own testimony to rebut the presumption of continuing disability. *See Early v. Heckler,* 743 F.2d 1002 at 1007 (3d Cir.1984) (unrepresented claimant's equivocal testimony not substantial evidence of improvement). Therefore, given the administration's power to require the claimant to submit to medical examinations, 20 C.F.R. § 404.1517 (1984), our concerns for fairness and administrative consistency suggest that medical evidence rather than claimant's testimony standing alone should furnish the basis to rebut the *Kuzmin* presumption. It is conceivable that in a given case medical evidence will not be sufficient to rebut the presumption but that extremely damaging admissions made by the claimant would be sufficient. Therefore, it is not possible to categorically state that a claimant's testimony, standing alone, can never constitute sufficient evi-

dence to rebut the *Kuzmin* presumption, but such cases should be rare.

### IV.

In light of the foregoing we will reverse the summary judgment in favor of the Secretary with instructions to remand to the Secretary for reinstatement of benefits commencing August, 1981.